**ORAL ARGUMENT REQUESTED BUT NOT YET SCHEDULED**

# In the United States Court of Appeals for the District of Columbia Circuit

### No. 14-1226
### (Consolidated with 14-1273 and 15-1002)

**OAK HARBOR FREIGHT LINES, INC.,**
*Petitioner,*

*vs.*

**NATIONAL LABOR RELATIONS BOARD,**
*Respondent.*

**TEAMSTERS UNION LOCAL NUMBER 174, et al.**
*Intervenors.*

*On Petitions for Review and Cross-Application for Enforcement of an Order of the National Labor Relations Board*

## BRIEF OF PETITIONER OAK HARBOR FREIGHT LINES, INC.

John M. Payne, D.C. Cir. Bar #54201
Selena C. Smith, D.C. Cir. Bar #54203
Davis Grimm Payne & Marra
701 Fifth Avenue, Suite 4040
Seattle, WA 98104
jpayne@davisgrimmpayne.com/ssmith@davisgrimmpayne.com
(206) 447-0182

Peter N. Kirsanow, D.C. Cir. Bar #54050
Benesch, Friedlander, Coplan & Aronoff
200 Public Square, Suite 2300
Cleveland, OH 44114-2378
pkirsanow@beneschlaw.com
(216) 363-4481

*Attorneys for Petitioner Oak Harbor Freight Lines, Inc.*

November 18, 2015

## <u>CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES</u>

Pursuant to Rule 28(a)(1) of Circuit Rules of the United States Court of Appeals for the District of Columbia, Petitioner Oak Harbor Freight Lines, Inc. states as follows for its Certificate as to Parties, Rulings, and Related Cases.

**1.     Parties and *Amici***

The Petitioner is Oak Harbor Freight Lines, Inc. ("Oak Harbor"). The Respondent is the National Labor Relations Board (the "NLRB" or "Board"). Teamsters 174 and Teamsters Locals 81, 174, 231, 252, 324, 483, 589, 690, 760, 763, 839 and 962 ("the Union") are the Intervenors (and Cross-Petitioners). There is no *amicus curiae*.

**2.     Rulings Under Review**

The ruling under review is the NLRB's Decision and Order, 361 NLRB No. 82 (October 31, 2014), which incorporates by reference the NLRB's Decision and Order, 358 NLRB No. 41 (May 16, 2012).

**3.     Related Cases**

The Union filed a petition for review of the same underlying NLRB Decision and Order, 361 NLRB No. 82 (October 31, 2014), in the U.S. Court of Appeals for the Ninth Circuit (9th Cir. Case No. 14-73402). On November 21, 2014, the U.S. Judicial Panel on Multidistrict Litigation selected the U.S. Court of Appeals for the D.C. Circuit as the circuit in which to consolidate the two pending

petitions for review. (Doc. No. 1524800.) On December 3, 2014, Oak Harbor filed a Motion for Leave to Intervene in the Unions' review proceeding. (*See* D.C. Cir. Case No. 14-1273; Doc. No. 1526526.) This Court granted Oak Harbor's Motion for Leave to Intervene on December 10, 2014. (D.C. Cir. Case No. 14-1273; Doc. No. 1526551.)

Previously pending before this Court were D.C. Circuit Case Nos. 12-1226, 12-1358, and 12-1360, which involved substantially similar issues as the present case. At issue in D.C. Circuit Case Nos. 12-1226, 12-1358, and 12-1360 was the NLRB's Decision and Order, reported at 358 NLRB No. 41 (May 16, 2012). The NLRB's May 16, 2012 Decision and Order (358 NLRB No. 41) has been incorporated by reference in the NLRB's October 31, 2014 Decision and Order (361 NLRB No. 82), which is the subject of this review proceeding. This Court remanded the previously pending cases (D.C. Circuit Case Nos. 12-1226, 12-1358, and 12-1360) to the NLRB on August 1, 2014 (*see* D.C. Circuit Case Nos. 12-1226, 12-1358, and 12-1360; Doc. No. 1505581). On October 31, 2014, the NLRB issued the Decision and Order on review in this proceeding (361 NLRB No. 82).

There are no other pending related cases to Oak Harbor's knowledge.

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure and Rule 26.1 of the Circuit Rules of the United States Court of Appeals for the District of Columbia, Oak Harbor Freight Lines, Inc., by and through its attorneys, Davis Grimm Payne & Marra and Benesch, Friedlander, Coplan & Aronoff, hereby certifies that:

Oak Harbor is a for-profit closely-held corporation organized under the laws of the State of Washington.  Oak Harbor operates a multi-state transportation, delivery, and logistics service business.  Oak Harbor has no corporate parents, and no publicly-held corporation owns more than 10% or more of Oak Harbor's stock.

# **TABLE OF CONTENTS**

**Page**

Certificate as to Parties, Rulings, and Related Cases ii

Corporate Disclosure Statement iv

Table of Authorities viii

Glossary of Terms xii

Jurisdiction 1

Statutes and Regulations 2

Statement of Issues 3

Statement of the Case 4

Statement of Facts 5

      A.    The Expired Labor Agreement and 5
             Inception of the Strike.

      B.    The Cancellation of Benefits Contributions, 6
             and the Trust Funds' Refusal to Accept
             Contributions after September 30, 2008.

      C.    October - December 2008:  Negotiations 8
             Regarding Benefits During the Strike.

      D.    February 2009:  End of the Strike and 10
             Post-Strike Negotiations Regarding Benefits
             for Returning Strikers.

Summary of Argument 16

Standing 18

**TABLE OF CONTENTS (CONT'D.)**

**Page**

Argument                                                                              18

   A.    Standard of Review                                        18

   B.    The Board Erred in Concluding that Oak            19
         Harbor Violated Sections 8(a)(5) and (1) of the
         Act by Ceasing Contributions to the Oregon Trust.

        1.    The Board erred in concluding that no          19
             waiver occurred with respect to the
             Oregon Trust contributions.

        2.    Alternatively, the Board erred in              23
             rejecting Oak Harbor's equitable
             estoppel argument.

   C.    The Board Erred in Concluding that Oak Harbor     29
         Violated Sections 8(a)(5) and (1) of the Act by
         Unilaterally Implementing its Company Medical
         Plan on February 26, 2009.

        1.    The Board erred in finding that Oak            29
             Harbor unilaterally implemented the
             Company medical plan.  Rather, the
             evidence shows that the Employer applied
             the status quo of the Company medical
             plan to returning strikers.

        2.    Alternatively, the Board erred in              31
             failing to find that the parties had reached
             impasse on the interim benefits issue after
             bargaining in good faith between
             February 17 and 26, 2009.

# <u>TABLE OF CONTENTS (CONT'D.)</u>

<u>**Page**</u>

3.    To the extent the Board adopted the ALJ's    41
Determination that the bargaining over
benefits was part and parcel of overall
contract negotiations, such conclusion
must be reversed as not supported by
substantial evidence.

Conclusion    44

Certificate of Compliance With Rule 32(a)    45

Certificate of Service    46

Addendum of Statutes and Regulations    48

# TABLE OF AUTHORITIES*[1]

| **Cases** | **Page** |
|---|---|
| *15th Avenue Iron Works*, <br> 301 NLRB 878 (1991), <br> enfd., 964 F.2d 1336 (2nd Cir. 1992) | 32 |
| *\*Alpha Associates*, <br> 344 NLRB 782 (2005), <br> enfd., 195 Fed. Appx. 138 (4th Cir. 2006)(unpublished) | 25 |
| *\*Americana Healthcare Center*, <br> 273 NLRB 1728 (1985), <br> enfd. in relevant part, 782 F.2d 941 (11th Cir. 1986) | 24, 28-29 |
| *\*ATC Petroleum, Inc. v. Sanders*, <br> 860 F.2d 1104 (D.C. Cir. 1988) | 26-27 |
| *Avecor, Inc. v. NLRB*, <br> 931 F.2d 924 (D.C. Cir. 1991), <br> cert. denied, 502 U.S. 1048 (1992) | 19 |
| *Avne Systems*, <br> 331 NLRB 1352 (2000) | 32 |
| *\*Bottom Line Enterprises*, <br> 302 NLRB 373 (1991), <br> enfd., 15 F.3d 1087 (9th Cir. 1994)(unpublished) | 33-34 |
| *CalMat Co.*, <br> 331 NLRB 1084 (2000) | 33 |
| *Comau, Inc. v. NLRB*, <br> 671 F.3d 1232 (D.C. Cir. 2012) | 18-19 |
| *Dixon Distributing Co.*, <br> 211 NLRB 241 (1974) | 33 |

---

[1] Authorities upon which Oak Harbor chiefly relies are marked with asterisks (*).

## TABLE OF AUTHORITIES (CONT'D.)

**Cases**                                                                       **Page**

*Electrical South, Inc.,*                                                          36
327 NLRB 270 (1998)

*Graham v. S.E.C.,*                                                               27
222 F.3d 994 (D.C. Cir. 2000)

*Heckler v. Community Health Services,*                                           27
467 U.S. 51 (1984)

*Hi-Grade Materials Co.,*                                                         40
239 NLRB 947 (1978)

*Laurel Bay Health & Rehabilitation Center,*                                      33
353 NLRB 232 (2008),
adopted by 356 NLRB No. 3 (2010),
enfd. in part, 666 F.3d 1365 (D.C. Cir. 2012)

*Lehigh Portland Cement Co.,*                                                   24-25
286 NLRB 1366 (1987)

*Mail Contractors of America, Inc.,*                                            34-35
346 NLRB 164 (2005)

*Manitowoc Ice, Inc.,*                                                          23-24
344 NLRB 1222 (2005)

*McAllister Bros.,*                                                               30
312 NLRB 1121 (1993)

*National Management Consultants,*                                                39
313 NLRB 405 (1993)

*New Associates,*                                                                 32
314 NLRB 893 (1994)

ix

## TABLE OF AUTHORITIES (CONT'D.)

| **Cases** | **Page** |
|---|---|
| *Pirlott v. NLRB*, 522 F.3d 423 (D.C. Cir. 2008) | 18-19 |
| *PRC Recording Co.*, 280 NLRB 615 (1986), enfd., 836 F.2d 289 (7th Cir. 1987) | 32 |
| *\*RBE Electronics*, 320 NLRB 80 (1995) | 34 |
| *Red Coats, Inc.*, 328 NLRB 205 (1999) | 25 |
| *R.P.C., Inc.*, 311 NLRB 232 (1993) | 25 |
| *\*St. Mary's Hospital of Blue Springs*, 346 NLRB 776 (2006) | 34 |
| *Taft Broadcasting Co.*, 163 NLRB 475 (1967), enfd., 395 F.2d 622 (D.C. Cir. 1968) | 32-33 |
| *\*TruServ Corp. v. NLRB*, 254 F.3d 1105 (D.C. Cir. 2001), cert. denied, 534 U.S. 1130 (2002) | 32-33 |
| *Tucker Steel Corp.*, 134 NLRB 323 (1961) | 23 |
| *\*Vincent Industrial Plastics, Inc. v. NLRB*, 209 F.3d 727 (D.C. Cir. 2000) | 36 |

## <u>TABLE OF AUTHORITIES (CONT'D.)</u>

| **<u>Statutes</u>** | **<u>Page</u>** |
|---|---|
| 29 U.S.C. § 158(a)(1) (2015) | 3, 4, 18, 19, 29, 49 |
| *29 U.S.C. § 158(a)(5) (2015) | 3, 4, 18, 19, 24, 28, 29, 49 |
| *29 U.S.C. § 158(d) (2015) | 40, 49 |
| 29 U.S.C. § 160(a) (2015) | 2, 50 |
| 29 U.S.C. § 160(e) (2015) | 2, 50-51 |
| 29 U.S.C. § 160(f) (2015) | 2, 18, 51-52 |

| **<u>Other Authorities</u>** | **<u>Page</u>** |
|---|---|
| *Pro Quo Books* 2010 WL 2020778 (N.L.R.B.G.C.) | 34 |

## <u>GLOSSARY OF TERMS</u>

**"NLRA" or "the Act"** refers to the National Labor Relations Act.

**"NLRB" or "Board"** refers to the National Labor Relations Board.

**"Oregon Trust"** (as used in this brief) refers to the Oregon Warehouseman's Teamsters Trust.

**"Trust Funds"** (as used in this brief) refer collectively to the Western Conference of Teamsters Pension Trust, the Washington Teamsters Welfare Trust, the Washington Retirees Welfare Trust, and the Oregon Warehouseman's Teamsters Trust.

**"Washington Trust Funds"** (as used in this brief) refer collectively to the Western Conference of Teamsters Pension Trust, the Washington Teamsters Welfare Trust, and the Washington Retirees Welfare Trust.

xii

## JURISDICTION

The General Counsel issued a consolidated Complaint in the underlying National Labor Relations Board ("NLRB" or "Board") proceeding on June 29, 2009. (GC Exh. 1(ee).) Oak Harbor Freight Lines, Inc. ("Oak Harbor," "the Employer," or "the Company") was named as the Respondent in the NLRB proceedings below. (*Id.*) The Complaint was amended multiple times. On May 24, 2010, Counsel for the General Counsel issued its Fourth Amended Complaint, and the Regional Director for Region 19 of the NLRB issued a Notice of Hearing. (GC Exh. 1(rr).)

A trial was held in this matter from July 6 to 20, 2010, in Seattle, Washington. The Administrative Law Judge ("ALJ") issued a decision on January 5, 2011. The parties subsequently filed exceptions and cross-exceptions with the NLRB.

On May 16, 2012, the NLRB issued a Decision and Order (358 NLRB No. 41). That Decision and Order was the subject of review proceedings previously before this Court (D.C. Circuit Case Nos. 12-1226, 12-1358, and 12-1360). On August 1, 2014, this Court remanded these previously pending cases to the NLRB. (*See* D.C. Circuit Case No. 12-1226, Doc. No. 1505581.)

On October 31, 2014, the Board issued the final Decision and Order on review in this proceeding (361 NLRB No. 82) (the Board's "Decision"). On

November 4, 2014, Oak Harbor timely filed a Petition for Review of the Board's Decision with this Court. (Doc. No. 1521532.) The National Labor Relations Act ("the Act" or "NLRA") sets no time limit for petitions for review. On November 4, 2014, the Teamsters Union Local 174, et al., ("the Union") filed a petition for review in the United States Court of Appeals for the Ninth Circuit involving the same underlying Board Decision. (Doc. No. 1526524.)

On December 19, 2014, the Ninth Circuit transferred the Union's Petition for Review to this Court pursuant to an Order of the United States Judicial Panel on Multidistrict Litigation. (Doc. Nos. 1524800, 1526524.) On January 5, 2015, the NLRB filed a cross-application for enforcement of its Decision. (Doc. No. 1531754.) This Court consolidated these pending, related cases by Orders dated December 10, 2014 and January 13, 2015. (Doc. Nos. 1526553, 1531764.)

The NLRB had jurisdiction over the underlying unfair labor practice charges pursuant to 29 U.S.C. § 160(a). Oak Harbor's Petition for Review is from a final order that disposes of all parties' claims relating to liability for the unfair labor practices at issue. The U.S. Court of Appeals for the D.C. Circuit has jurisdiction over these consolidated cases pursuant to 29 U.S.C. §160(e)-(f).

## STATUTES AND REGULATIONS

Pertinent statutes and regulations are set forth in the addendum to this Brief.

## STATEMENT OF ISSUES

Issue #1.  Did the Board err in concluding that Oak Harbor violated Sections 8(a)(5) and (1) of the Act by unilaterally ceasing payments into the Oregon Warehouseman's Teamsters Trust ("Oregon Trust")?

Issue #2.  Did the Board err in concluding that the Union was not equitably estopped (or barred by the doctrine of laches or mutual mistake) from challenging Oak Harbor's cessation of contributions to the Oregon Trust?

Issue #3.  Did the Board err in concluding that Oak Harbor violated Sections 8(a)(5) and (1) of the Act by unilaterally implementing its Company medical plan for bargaining unit employees after the conclusion of the strike?

Issue #4.  Did the Board err in concluding that Oak Harbor violated Sections 8(a)(5) and (1) of the NLRA by refusing to bargain in good faith with the Union regarding medical benefits?

Issue #5.  Did the Board err in failing to find that Oak Harbor and the Union bargained to impasse in negotiations from February 17, 2009 through February 25, 2009, regarding benefits for returning strikers pending the outcome of overall labor agreement negotiations?

Issue #6.  Did the Board err in failing to find that Oak Harbor raised the issue of bargaining to impasse regarding benefits for returning strikers in its Answer?  Alternatively, did the Board err in failing to conclude that Oak Harbor's

3

Motion to Amend its Answer before the Administrative Law Judge should have been granted?

Issue #7.  Did the Board err in failing to find that an economic exigency existed, which permitted Oak Harbor to bargain to impasse with the Union regarding benefits for returning strikers, pending the outcome of overall labor agreement negotiations?

## STATEMENT OF THE CASE

The relevant procedural history of this matter is set forth in the Jurisdiction Section above.  The Board erroneously concluded in this case that Oak Harbor violated Sections 8(a)(5) and (1) of the NLRA by ceasing contributions to the Oregon Trust.  (Board Decision, pp. 1-2.)  The Board's Decision overturning the ALJ on this matter is not supported by substantial evidence and is contrary to established Board precedent.  The Board and the ALJ also erroneously concluded that Oak Harbor violated Sections 8(a)(5) and (1) of the NLRA by implementing its Company medical plan for bargaining unit employees after the conclusion of the strike.  (Board Decision, p. 2.)  Rather, the evidence and the law demonstrate that Oak Harbor lawfully ceased contributions to the Oregon Trust and lawfully applied the status quo of the Company medical plan to returning strikers.  The facts of this matter are set forth below.

## STATEMENT OF FACTS

Oak Harbor is a trucking company doing business in Washington, Oregon, California, Nevada, and Idaho. It employs approximately 1,200 employees. Approximately 50% of those employees are represented by the Teamsters Union Locals 81, 174, 231, 252, 324, 483, 589, 690, 760, 763, 839 and 962 (collectively referred to as "the Union"). (Tr. 980-81.)[2]

### A. The Expired Labor Agreement and Inception of the Strike.

The Expired Contract. The most recent labor agreement between the Employer and the Union had a term of November 2004 through October 31, 2007. (GC Exh. 2.) The parties began negotiating for a successor agreement in August 2007. The Employer was represented by Director of Labor Relations Robert Braun and Attorney John Payne. (Tr. 980.) Al Hobart, President of Joint Council 28, served as the Union's chief spokesman during the time periods relevant to this appeal. (Tr. 983.)

Negotiations and Inception of the Strike. The parties had approximately 30 bargaining sessions between August 2007 and September 22, 2008. This included two pre-strike FMCS mediation sessions. The Employer hand-delivered a last best and final offer to the Union on September 22, 2008. The Union struck later that same day. (Tr. 982-83.)

---

[2] References to testimony are at the end of the paragraph in which it is referenced, unless otherwise indicated.

5

**B.** __The Cancellation of Benefits Contributions, and the Trust Funds'__
__Refusal to Accept Contributions after September 30, 2008.__

The Expired Labor Agreement/Benefit Plans and Cancellation Notices.  The
expired labor agreement contained Taft-Hartley benefit plans for the Western
Conference of Teamsters Pension Trust, the Washington Teamsters Welfare Trust,
the Oregon Warehouseman's Teamsters Trust ("Oregon Trust"), and the
Washington Retirees Welfare Trust (collectively referred to as the "Trust Funds").
(GC Exh. 2, Art. 17.)

At least three of the above-referenced benefit plans required the Union, the
Employer, and the Trust Fund to sign Subscription Agreements[3] containing various
contractual payment promises and a termination provision.  Pursuant to the
Subscription Agreements' termination clause, the Employer sent cancellation
notices to the Union with copies to the Trust Funds.  (GC Exhs. 37-45(a).)

Regarding the Oregon Trust, the Employer was not certain whether a signed
Subscription Agreement existed on file.  The parties had negotiated into the
Oregon Trust in 1995.  (GC Exh. 45(b).)  Braun advised Payne that he believed he
[Braun] had executed such a Subscription Agreement for the Oregon Trust.  (Tr.
1096, 1265-66.)  Payne called Linda Philbrick of the Oregon Trust, who said she
thought they had such a signed Subscription Agreement on file.  (The Oregon

---

[3] The term "Subscription Agreement" used in this Brief is also used to refer to the
Employer-Union Certification required by the Western Conference of Teamsters
Pension Trust.

Trust is administered by Northwest Administrators, which requires Subscription Agreements for its other plans.)  Philbrick said she would try to locate the Subscription Agreement.  Philbrick suggested that Payne call an individual named "Matt" at Northwest Administrators, who could also check on this matter.  Payne called Matt and was told Matt believed there was a Subscription Agreement on file, but he would have to look for it.  Neither Philbrick nor Matt ever called Payne back.  (Tr. 986-87.)

Payne then wrote a conditional Notice of Intent to Cancel the Oregon Trust obligations to the Union and sent a copy to the Oregon Trust on September 23, 2008. Payne's letter stated the Notice of Intent to Cancel was "…being provided pursuant to the Oregon Subscription Agreement, if such an Agreement containing a Notice of Intent to Cancel clause exists."  (GC Exh. 45(a).)  No representative from the Oregon Trust or the Union ever informed Oak Harbor that no Subscription Agreement existed.  (Tr. 921-23, 929, 943-44, 1099-1101, 1175.)

<u>Trust Funds' Refusal to Accept Contributions After September 30, 2008</u>.  In late September 2008, Payne wrote to the four Trust Funds to inquire whether they would continue to accept contributions for crossovers (*i.e.*, employees who abandoned the strike and crossed the picket line to continue working).  Each Trust Fund responded to Payne that they would not accept contributions as a result of the Employer's Notices of Intent to Cancel. (GC Exhs. 42-53.)  Attorney Jerome

7

Buckley responded on behalf of the Oregon Trust. He informed Payne that the Trust <u>would not accept contributions for crossovers</u>.  He never disavowed the existence of a Subscription Agreement.  (Tr. 1099-1101; GC Exhs. 45, 52.)

## C. <u>October–December 2008:  Negotiations Regarding Benefits During the Strike.</u>

<u>October 3-9, 2008</u>.  Because the Trust Funds would not accept contributions for crossovers, the Employer bargained the impact of this situation with the Union. On October 3, 2008, Payne proposed a temporary plan to the Union with respect to benefits contributions for crossovers:  (1) place the Pension contributions in an Oak Harbor escrow account on behalf of crossovers; (2) temporarily cover crossovers under the Company's medical plan; and (3) place Retirees Trust contributions in an Oak Harbor escrow account.  (GC Exh. 54.)  Oak Harbor's proposal specified it would be a temporary arrangement, pending the outcome of overall contract negotiations and the strike.  (GC Exh. 54.)

On October 9, 2008, Oak Harbor and the Union met in mediation.  In response to the Employer's October 3, 2008 proposal, Union Spokesman Hobart informed Payne that, "Regarding the Trust Funds, the escrow account is ok." Regarding the Company medical plan, Hobart said:  "Company plan is ok with us." (Tr. 992-93; Resp. Exh. 12, pp. 1-2.)

<u>November 12-17, 2008</u>.  Another contribution issue arose involving certain strikers who were paid vacation hours after the Employer's Notices of Cancellation

had been sent to the Trust Funds. The Trust Funds would not accept contributions for strikers' vacation hours paid after September 30, 2008. (Tr. 1010-11, 1095.) Therefore, Payne wrote to Hobart on November 12, 2008, explaining the situation and proposing to escrow the Pension connected to these vacation hours and to pay the Health & Welfare and Retirees Health & Welfare premiums directly to the striking employees. (GC Exh. 65.) Hobart agreed with Payne's proposal in a letter dated November 17, 2008. (GC Exh. 66; ALJ Decision 8:7.)

December 5-10, 2008. On December 5, 2008, Attorney Buckley (for the Oregon Trust) sought clarification from Payne about Health & Welfare contributions made on behalf of four employees whom he believed were crossover employees. Buckley claimed those employees should be covered under the Company medical plan, not the Oregon Trust. (Resp. Exh. 13.) Again, Buckley did not assert that no Subscription Agreement existed for the Oregon Trust. Nor did he claim that the Oregon Trust would accept contributions. In fact, Buckley took the opposite position. He refused to accept contributions. (Tr. 1158:20; Resp. Exh. 13.)

On December 10, 2008, Payne wrote to Buckley, explaining that these four employees had put in for vacation and holidays which had accrued and were paid prior to the Employer's September 23, 2008 Notice to Cancel the Subscription Agreement. Therefore, the Employer's contributions were proper. (Resp. Exh. 14.)

9

Buckley never replied to Payne's December 10, 2008 letter; nor did he state that no Subscription Agreement existed for the Oregon Trust.  (Tr. 1099, 1158:20.)

D. **February 2009:    End of the Strike and Post-Strike Negotiations Regarding Benefits for Returning Strikers.**

February 12-17, 2009.  On February 12, 2009, the Union sent the Employer a letter stating that the strike was ending, and the Union was making an unconditional offer to return to work.  (GC Exh. 74.)

On February 17, 2009, the Union and the Employer met to discuss the strikers' orderly return to work.  Payne and Braun were present on behalf of Oak Harbor.   Hobart and other national and local Teamsters representatives were present on behalf of the Union (including Tom Strickland from Oregon Teamsters Local 81).  (Tr. 1016-22, 1228-29.)

At the meeting, Payne passed out a proposal on how to deal with benefits contributions for the returning strikers.  (GC Exh. 25.)  That letter explained that the Trust Funds were still not accepting contributions for hours compensated after September 30, 2008 because the Employer had sent Notices of Intent to Cancel contributions.  This was the status quo.  Payne proposed that the parties maintain the status quo for the returning strikers, including: (1) escrowing Pension contributions; (2) escrowing Retirees Health & Welfare contributions; and (3) covering the returning strikers under the Company medical plan.  (GC Exh. 25.)

10

Hobart was displeased.   Hobart expected the Employer to sign **new** Subscription Agreements and to initiate contributions back into the Union benefit plans.  (Tr. 1173:12; 1238.)

The February 17, 2009 meeting ended with Hobart stating that he would talk to his attorney and would contact the Company.  Hobart added:  "Our return is in neutral."  (Tr. 1024, 1235; Resp. Exh. 15, p. 13.)  The strikers did not return to work until February 26, 2009.  (Tr. 1074.)

February 18, 2009.  A new development occurred.  On February 18, 2009, Hobart sent a letter to Payne which addressed the Trust Funds issue.  (GC Exh. 75(a-d).)  In that letter, Hobart proposed that the parties:  (1) sign new Subscription Agreements and (2) sign a new Interim Labor Agreement to support the underlying Subscription Agreements.  (The Subscription Agreements required the existence of a valid underlying labor agreement.)   The Trust Funds had conditioned their acceptance of new contributions upon both of these documents being executed. Hobart's letter attached emails from Northwest Administrators, setting forth these requirements.   (GC  Exh.  75(a)-(d).)   (Northwest  Administrators  is  the administrator of the Washington Trust Funds and the Oregon Trust.)   Hobart claimed that the Employer had a legal duty to make the contributions and execute the Trusts' required agreements.  (GC Exh. 75, p. 2.)

11

February 19, 2009.   Union Attorney David Ballew telephoned Payne to discuss the Trust Funds issue and 13 strikers who had been suspended for strike misconduct, pending investigation.  Ballew asserted that the Employer "must get back to the status quo" by signing a new Interim Labor Agreement and new Subscription Agreements and putting the employees back in the Union plans.  (Tr. 592:1, 593:21.)  Payne asserted that the status quo was changed by the intervening events of:  (1) the 2008 Notices to Cancel the Subscription Agreements, and (2) all Trust Funds not accepting contributions after September 30, 2008.  (Tr. 592:1, 593:21, 1038.)

February 20, 2009.  Braun telephoned Hobart.  Braun advised Hobart that he felt he could persuade the Employer's owners to agree to return to the Union Pension plan for the returning strikers.  However, for cash flow reasons, Oak Harbor wanted to continue the Company medical plan for the returning strikers.  Hobart responded by stating that he wanted the returning strikers put back into all of the Union's benefit plans.  These discussions were interim in nature – arising out of the Trust Funds' refusal to accept contributions until a new labor agreement and new Subscription Agreements were negotiated.  There was no discussion about full contract bargaining.  (Tr. 1244-46.)

February 21, 2009.  Payne and Ballew spoke by phone about benefits for returning strikers.  Payne advised Ballew that, as an alternative to its earlier

12

(February 17, 2009) proposal, Oak Harbor might consider the Union Pension and the Company medical plan for the returning strikers.  This was a middle-ground proposal between the Employer's February 17, 2009 proposal for returning strikers and the Union's February 18, 2009 offer (GC Exh. 75), that both parties sign a new Interim Labor Agreement and new Subscription Agreements for all Union benefit plans.  Ballew said he would check with Hobart.  (Tr. 1045-46; Resp. Exh. 17.)  It was a "what if" offer by Oak Harbor.  Again, these discussions addressed the interim problem of what to do with benefits for the returning strikers, pending the outcome of full contract negotiations.

February 22, 2009.  Payne and Ballew spoke again by phone.  Payne again told Ballew that the Company might be willing to place the returning strikers in the Union's Pension plan, but it wanted the Company medical plan and escrow Retirees Health & Welfare for the returning strikers.  (Tr. 1049; Resp. Exh. 18.)

Ballew replied:  "Hobart won't do it.  You'll get it [Company medical plan] in negotiations anyway.  In fact, you got it [referring to a previous mediation session]!"  (Tr. 1049-50; Resp. Exh. 18.)  The Union continued to maintain the position that Oak Harbor must sign an Interim Labor Agreement and new Subscription Agreements for all Union benefit plans.  Ballew said he would send Payne a draft Interim Labor Agreement for Payne to review.  (Tr. 1052.)

13

February 23, 2009.   Ballew sent Payne a draft "Interim Agreement" for Payne's review.   That "Interim Agreement" was a one-page labor agreement calling for Teamsters Medical, Teamsters Pension, Teamsters Retirees Health & Welfare, full maintenance of benefits, and additional conditions of employment. There is no dispute that this was a proposed Interim Labor Agreement – pending full contract negotiations.  (Tr. 1054; GC Exh. 82(a-b).)

February 24, 2009.   Payne called Ballew to discuss the Union's proposed "Interim Agreement."   Payne again suggested the Company medical plan as a temporary alternative for the returning strikers.   Ballew rejected this idea.   (Tr. 1055.)  There was a discussion about the Union's proposed duration clause (in the Interim Agreement).   However, no agreement was reached regarding the Union's proposed Interim Agreement.  (Tr. 1055-56; Resp. Exh. 19.)

In the meantime, Braun spoke to Hobart again by telephone on February 24, 2009.  Braun proposed to Hobart that Oak Harbor was willing to put the returning strikers back into the Union's Pension plan, pending further negotiations on the entire labor agreement.   However, the Employer wanted to put the returning strikers into the Company medical plan, while full contract negotiations were ongoing.  Hobart flatly refused.  He insisted that the Employer sign the documents (proposed Interim Agreement and Subscription Agreements) and re-enter all of the Union benefit plans.  (Tr. 1247-49; Resp. Exh. 26.)  These discussions were not

14

negotiations for a successor labor agreement.  They focused on an interim measure to deal with the Trust Funds' refusal to accept contributions.  (Tr. 1253-54.)

February 25, 2009.  Ballew called Payne.  Payne again proposed that the returning strikers be placed in the Company medical plan and the Union's Pension plan.  Ballew rejected this "what if" idea.  Ballew said that the strikers were coming back to work, and the Union would let the NLRB sort out their existing conditions.  (Tr. 1066; Resp. Exh. 20.)  The ALJ credited Ballew that Payne told Ballew that he could no longer speak with Ballew because the Union and Oak Harbor were making progress toward a labor agreement.  (ALJ Decision 10:1.)

February 26, 2009.  The strikers began returning to work.  (Tr. 1074:7.)  The Employer did not sign new Subscription Agreements; nor did it agree to the Union's proposed Interim Labor Agreement.  The Employer continued to place Teamsters Pension contributions at $3.21 per hour in escrow.  It continued to escrow Retirees Health & Welfare contributions, and it placed the returning strikers under the Company medical plan.  Without a new agreed-upon (Trust-required) Interim Labor Agreement and Subscription Agreements, this was the logical step.  It was also the agreed-upon status quo that had been in place since October 2008 for the crossovers and the Employer's offer of February 17, 2009.  (Tr. 1117-19, 1278, 1288.)  Oak Harbor continued this arrangement for all of its bargaining unit employees.  (Tr. 1260-62, 1287-88, 1301-03.)

## SUMMARY OF ARGUMENT

On September 23, 2008, Oak Harbor sent a conditional Notice of Intent to Cancel contributions to the Union and the Oregon Trust. Oak Harbor's Attorney (Payne) sent a follow-up letter to the Oregon Trust on September 24, 2008, in which he inquired whether the Oregon Trust would accept contributions for crossover employees, given the conditional Notice to Cancel. In response, the Oregon Trust refused to accept contributions after September 30, 2008.

In October through December 2008, Oak Harbor and the Union bargained over interim benefits issues which arose during the strike. The parties agreed to the following interim benefits arrangement for crossovers during the strike: (1) escrow Teamsters Pension contributions; (2) escrow Teamsters Retirees Health & Welfare contributions; and (3) place the crossovers in the Company medical plan. During the strike, this interim benefits arrangement became the status quo.

After the strike ended in February 2009, the Trust Funds and the Union insisted that the Employer must sign a new Interim Labor Agreement and new Subscription Agreements to revive benefits contributions to the Trust Funds. No distinction was made by the Union between the Oregon Trust and the Washington Trust Funds.

At no time in 2008 or 2009 did the Union or the Oregon Trust challenge Oak Harbor's cancellation of Oregon Trust contributions pursuant to the Subscription

16

Agreement (referenced in Payne's September 23 and 24, 2008 letters to the Oregon Trust).  Neither the Oregon Trust nor the Union ever told Oak Harbor that no Subscription Agreement was in place for Oregon.  In fact, the Oregon Trust reacted as if a cancelled Subscription Agreement was in place.  They never disputed Oak Harbor's position that it had cancelled contributions to the Oregon Trust pursuant to a valid Subscription Agreement.  It was not until the trial in this matter that the Oregon Trust Administrator Mark Coles asserted that the Oregon Trust did not require a Subscription Agreement.  This claim came nearly two years after Oak Harbor notified the Oregon Trust and the Union of its cancellation of contributions. The Union cannot rely on this belated assertion by the Oregon Trust to insist that Oak Harbor violated the NLRA by ceasing contributions to the Oregon Trust in October 2008.  The Union's claim is barred by equitable estoppel.

From February 17 through 25, 2009, the Union and the Employer bargained over an interim benefits arrangement for the returning strikers.  The Employer offered a middle-ground ("what-if") proposal to the Union in an effort to reach a temporary benefits agreement, pending the outcome of full contract negotiations. The Union repeatedly rejected the Employer's proposal.  Instead, the Union insisted that the Employer sign new Subscription Agreements and a new Interim Labor Agreement.  The Union refused to consider any alternative to its position.

The parties were at impasse regarding benefits contributions for the returning strikers.

On February 26, 2009, when the strikers returned to work, Oak Harbor applied the then-existing temporary benefits arrangement to the returning strikers. The Employer simply applied the status quo. There was no unilateral change.

Alternatively, even if Oak Harbor's status quo argument is rejected, Oak Harbor lawfully implemented its bargaining proposal on February 26, 2009, after reaching impasse with the Union on an interim benefits arrangement for the returning strikers.

The Board's conclusions that Oak Harbor violated Sections 8(a)(5) and (1) of the Act must be overturned.

## STANDING

Oak Harbor has standing to challenge the Board's Decision pursuant to 29 U.S.C. § 160(f). Oak Harbor was the Respondent before the Board. It is a party "aggrieved by a final order of the Board." 29 U.S.C. § 160(f).

## ARGUMENT

### A. Standard of Review.

The Court's review of NLRB decisions is deferential. *Comau, Inc. v. NLRB*, 671 F.3d 1232, 1236 (D.C. Cir. 2012) (quoting *Pirlott v. NLRB*, 522 F.3d 423, 432 (D.C. Cir. 2008)). However, this Court does not "merely rubber-stamp NLRB

decisions." *Avecor, Inc. v. NLRB*, 931 F.2d 924, 927 (D.C. Cir. 1991), cert. denied, 502 U.S. 1048 (1992). The Court will vacate a Board decision "if the Board's factual findings are not supported by substantial evidence, or the Board acted arbitrarily or otherwise erred in applying established law to the facts of the case." *Pirlott*, 522 F.3d at 432 (internal quotations and citations omitted). "The Board cannot ignore its own relevant precedent but must explain why it is not controlling." *Comau*, 671 F.3d at 1236 (internal quotations and citations omitted). "Where an agency departs from established precedent without a reasoned explanation, its decision will be vacated as arbitrary and capricious." *Id.* (internal quotations and citations omitted).

### B. The Board Erred in Concluding that Oak Harbor Violated Sections 8(a)(5) and (1) of the Act by Ceasing Contributions to the Oregon Trust.

#### 1. The Board erred in concluding that no waiver occurred with respect to the Oregon Trust contributions.

The Board erred in reversing the ALJ's factual conclusion that a Subscription Agreement existed covering the Oregon Trust. (ALJ Decision 5:39.) The evidence is clear that Payne attempted to confirm with the Oregon Trust by telephone and in writing in September 2008 that a Subscription Agreement was in place. Payne called the Oregon Trust administrators (Linda Philbrick and Matt). Payne was told by both Philbrick and Matt that they believed a signed Subscription Agreement existed covering Oak Harbor and the Union. (Tr. 986:87.) Therefore,

19

Payne wrote a conditional Notice of Intent to Cancel on September 23, 2008. (GC Exh. 45(a).) Payne followed up with a written inquiry on September 24, 2008, as to whether the Oregon Trust would accept contributions given the conditional Notice of Intent to Cancel. (GC Exh. 47.)

In response, the Oregon Trust's attorney, Jerome Buckley, expressly rejected contributions for crossovers, and he rejected contributions for strikers after the Notice of Cancellation was submitted. (GC Exh. 52.) This was a response identical to that of the Washington Trust Funds, and it was a response consistent with the fact of a Subscription Agreement having been in place. In December 2008, Buckley again wrote to Payne, demanding clarification of vacation contributions that he contended should <u>not</u> be paid to the Oregon Trust. (Resp. Exh. 13.) Buckley never disavowed the existence of a Subscription Agreement. In fact, Buckley was making sure that contributions were <u>not</u> being submitted for post-October 1, 2008 hours after Payne's cancellation letter.

On February 17, 2009, the Employer explained to the Union that the Trust Funds (including the Oregon Trust) were rejecting all benefits contributions. No one on behalf of the Union (including Tom Strickland, from Teamsters Local 81 in Portland, Oregon) ever spoke up and declared that the Oregon Trust had no Subscription Agreement and would now accept contributions. (Tr. 1175:2, 1229.)

20

At the time the strike ended on February 26, 2009, the Union treated the Oregon Trust the same as the Washington Trust Funds in its dealings and communications with the Employer. (Tr. 1175.) The Union made no distinction between the Oregon Trust and the other Trust Funds. At <u>no</u> time did Buckley or any Union representative say: "There is no Subscription Agreement in Oregon, so make your contributions." (Tr. 1158.) Rather, the Oregon Trust refused to accept contributions and never varied from this position – even when the strike ended. (Tr. 1175.)

It was not until <u>one week before the trial</u> in July 2010 that Oregon Trust Administrator Mark Coles <u>first</u> received permission to accept contributions (through Attorney Buckley and one Union Trustee, Leedham). (Tr. 910:2.) How can this 2010 permission possibly bind the Employer back in February 2009? Obviously, it cannot.

In reversing the ALJ's conclusion on this issue, the Board relied on Coles' untimely assertion that, (as of July 2010), the Oregon Trust did not require a Subscription Agreement. (Tr. 903.) Neither the Union nor the Oregon Trust had ever asserted this position in the (nearly) two years after the Employer's conditional Notice of Intent to Cancel contributions in September 2008.

Furthermore, the NLRB provided no explanation for ignoring Coles' testimony that he never looked for a Subscription Agreement between the parties,

21

nor instructed anyone else to do so. (Tr. 916-18.) Coles was not even involved in the Oregon Trust until September 2008, long after Oak Harbor and the Union would have signed a Subscription Agreement to institute Oregon Trust contributions (in 1995). (Tr. 915.)

The Oregon Trust and the Union behaved consistently with the fact that a Subscription Agreement was in place and was properly cancelled by the Employer. At a minimum, the Union and the Oregon Trust overtly acquiesced in the position that a cancelled Subscription Agreement was in place. They further acquiesced in the understanding that Payne's conditional September 23, 2008 Notice of Intent to Cancel contributions to the Oregon Trust Fund effectively terminated the Employer's obligation to pay contributions to the Oregon Trust. Furthermore, in response to Payne's September 24, 2008 inquiry (GC Exh. 47), Buckley stated that the Oregon Trust would not accept contributions after September 30, 2008 (GC Exh. 52). At no time did Buckley disavow the existence of a Subscription Agreement. The only logical inference that can be drawn from Buckley's response is that the conditional Notice of Intent to Cancel had been accepted by the Oregon Trust to cease contributions pursuant to the parties' Subscription Agreement. The Union never argued otherwise.

The ALJ properly concluded that given these events, the Oregon Teamsters were party to a Subscription Agreement. The Union's and the Oregon Trust's

22

conduct in 2008 and 2009 evidenced a knowing acquiescence in the terms of such an Agreement, and a clear and unmistakable waiver of the Union's right to bargain over the cessation of contributions to the Oregon Trust. The Board's reversal of the ALJ's factual finding on this point is unsupported by the evidence.

### 2. **Alternatively, the Board erred in rejecting Oak Harbor's equitable estoppel argument.**

The principles of equitable estoppel bar the Union from prevailing on this issue. The Union is in no position to cry foul and claim that the Oregon Trust would have accepted contributions in 2009. The Union and the Oregon Trust remained silent in 2009 on their so-called right to receive contributions. They are in no position to now benefit by their silence and their acquiescence and seek retroactive contributions.

The NLRB's rejection of Oak Harbor's equitable estoppel argument is arbitrary and capricious. In *Manitowoc Ice, Inc.*, 344 NLRB 1222 (2005), the Board noted that it "has long recognized that principles of equitable estoppel will preclude a party from complaining of a unilateral change in a term or condition of employment where it has, by its conduct, led the other party to reasonably believe that it could deal unilaterally with the subject." *Id.* at 1223 (citing *Tucker Steel Corp.*, 134 NLRB 323, 333 (1961)). The union in *Manitowoc Ice* was barred from challenging the company's position regarding the terms of a profit-sharing plan by failing to challenge the company's stance when it first had the opportunity to do so.

23

344 NLRB at 1223-24.  The union was estopped from changing course and later challenging the company's position.  *Id.*

    *See also Americana Healthcare Center*, 273 NLRB 1728, 1728, 1733 (1985), enfd. in relevant part, 782 F.2d 941 (11th Cir. 1986), in which the company violated Section 8(a)(5) of the Act by unilaterally discontinuing sick leave benefits, after a year of acting consistently with its mistaken belief that sick leave benefits were required by the labor agreement.  *Id.* Its acquiescence bound the company. *Id.*

    Similarly, in *Lehigh Portland Cement Co.*, 286 NLRB 1366, 1382, n.3 (1987), the Board affirmed the ALJ's conclusion that Lehigh was estopped from challenging a merger between the cement workers and boilermakers unions one year after it first learned of the merger.  A year after bargaining with the merged union, the employer claimed that the merger was defective.  *Id.* at 1370.  However, Lehigh had previously submitted a contract proposal which recognized the merged union and continued to check off dues for that union.  *Id.* at 1383.  The union had no reason to believe that its merger was defective.  *Id.*  Lehigh's conduct (including bargaining with the merged union for a year) was consistent with the position that no defect existed.  *Id.*  Thus, the ALJ explained:  "In these circumstances equity requires that Respondent be estopped from challenging the Cement Workers merger."  *Id.*  Lehigh attempted to argue that it only learned of

24

the deficiency in the validity of the merger shortly before trial. *Id.* The ALJ rejected this argument, noting that "[i]f [a party] could evade the consequences of its actions simply by claiming a lack of knowledge, then a doctrine of equitable estoppel would rarely be invoked." *Id.*

Furthermore, in *Alpha Associates*, 344 NLRB 782, 783 (2005), enfd., 195 Fed. Appx. 138 (4th Cir. 2006)(unpublished), the Board concluded that the employer was equitably estopped from withdrawing recognition from the union based on its belated allegation that the recognized unit was inappropriate. The Board identified the elements of estoppel as: (1) knowledge; (2) intent; (3) mistaken belief; and (4) detrimental reliance. *Id.* (citing *Red Coats, Inc.*, 328 NLRB 205, 206 (1999); *R.P.C., Inc.*, 311 NLRB 232, 233 (1993)). The Board explained: "The principle of equitable estoppel is premised on the notion that a party that obtains a benefit by engaging in conduct that causes a second party to rely on 'the truth of certain facts' should not be permitted to later controvert those facts to the prejudice of the second party." *Alpha Associates*, 344 NLRB at 783 (citing *R.P.C.*, 311 NLRB at 233). In finding the employer in *Alpha Associates* was estopped from withdrawing recognition from the union, the Board emphasized that the company had bargained with the union for over a year without challenging the propriety of the unit. 344 NLRB at 783-84.

Here, Oak Harbor relied on the Union's and the Oregon Trust's statements and conduct. The Union and the Oregon Trust acted consistently with the fact that a Subscription Agreement was in place for the Oregon Trust. All contributions were refused by Buckley. Thus, Oak Harbor reasonably believed it properly terminated the Oregon Trust's Subscription Agreement, as it had done for the other Trust Funds. The Union never disavowed the existence of a Subscription Agreement for the Oregon Trust. In fact, Buckley rejected contributions following the Employer's conditional Notice to Cancel. Despite ongoing discussions regarding benefits in 2008 and 2009, neither the Union nor the Oregon Trust ever disputed the validity of Oak Harbor's cancellation of the Oregon Trust Subscription Agreement.

This Court also recognizes that a party may be estopped from asserting a claim inconsistent with its prior conduct. This Court has held that, to establish a claim of equitable estoppel, the party must show that: (1) there was a definite representation to the party claiming estoppel; (2) the party relied upon its adversary's conduct to its detriment; and (3) reliance on the representation was reasonable. *ATC Petroleum, Inc. v. Sanders*, 860 F.2d 1104, 1111 (D.C. Cir. 1988)(noting that doctrine of estoppel "preclude[es] a litigant from asserting an otherwise available claim or defense against a party who has detrimentally relied

26

on that litigant's conduct"); *see also Graham v. S.E.C.*, 222 F.3d 994, 1007 (D.C. Cir. 2000)(citing *Heckler v. Community Health Services*, 467 U.S. 51, 59 (1984)).

Here, neither the Union nor the Oregon Trust ever expressed any disagreement with Oak Harbor's legitimate understanding that a Subscription Agreement had been terminated by its September 23, 2008 conditional Notice of Intent to Cancel.  Furthermore, the Oregon Trust took the position that it could **not** accept contributions after September 30, 2008.  In February 2009, the Union took the position that Oak Harbor must sign an Interim Labor Agreement and new Subscription Agreements to revive the Union benefit plans.  At no time did the Union say that there was never a Subscription Agreement in place for Oregon. Oak Harbor reasonably relied on the Union's and the Oregon Trust's conduct in 2008 and 2009 indicating that an Oregon Subscription Agreement had been terminated.  The NLRB's failure to find that the Union was equitably estopped based on this conduct is contrary to Board precedent and unsupported by the evidence.[4]

---

[4] The ALJ did not expand upon his finding that Oak Harbor lawfully ceased contributions to the Oregon Trust.  It is arguable that the Board should have remanded the case back to the ALJ to address this issue.

It could also be argued that a mutual mistake was made regarding whether a signed Subscription Agreement existed for the Oregon Trust.  Both the Employer and the Union (and the Trust Fund) behaved as if one existed.  Where both Oak Harbor and the Union made decisions and took positions based on a mutual mistake of fact (the existence of a Subscription Agreement), then neither party can later successfully claim that the other party violated the Act in reliance upon the mutual mistake.  *See Americana Healthcare Center*, 273 NLRB 1728 (1985).

In *Americana Healthcare Center*, the Board affirmed the ALJ's determination that the employer violated Section 8(a)(5) of the Act by unilaterally discontinuing sick leave benefits for unit employees.  *Id.* at 1728.  The parties had discussed sick leave in bargaining when exchanging various economic proposals for a successor contract.  *Id.* at 1729-30.  The parties reached agreement on a successor labor contract, including the sick leave provision.  *Id.* at 1730.  However, the signed agreement did <u>not</u> contain the sick leave provision.  *Id.*  Despite this fact, the employer continued to pay sick leave benefits for unit employees as it had under the previous labor agreement.  *Id.* at 1731.  Approximately one year after the execution of the successor labor agreement, the parties realized the contract did not contain a sick leave provision.  *Id.*  The employer then terminated the sick leave benefits.  *Id.* at 1732.  The ALJ concluded, and the Board agreed, that the parties had not incorporated the agreed-upon sick leave provision in the successor labor

28

agreement by mutual mistake. *Id.* at 1728, 1733. The ALJ emphasized that the employer "routinely granted sick leave benefits" to unit employees in the first year after the labor agreement was ratified. *Id.* at 1733. The ALJ found that the employer acted in conformity with its (mistaken) belief that the labor agreement contained the sick leave provision. *Id.* Thus, the employer could not lawfully rely on the lack of a sick leave provision in the signed labor agreement to justify its unilateral termination of sick leave benefits for unit employees. *Id.* at 1728, 1733-34.

As discussed above, a party can be barred from asserting a position which is inconsistent with its previous conduct under the doctrines of equitable estoppel or mutual mistake. In the instant matter, the NLRB's erroneous rejection of Oak Harbor's equitable estoppel argument must be overturned.

### C. The Board Erred in Concluding that Oak Harbor Violated Sections 8(a)(5) and (1) of the Act by Unilaterally Implementing its Company Medical Plan on February 26, 2009.

### 1. The Board erred in finding that Oak Harbor unilaterally implemented the Company medical plan. Rather, the evidence shows that the Employer applied the status quo of the Company medical plan to returning strikers.

When a strike ends, an employer is required to restore pre-strike status quo (wages and benefits) for returning strikers unless an intervening event occurs. When an intervening event occurs, the duty to restore the pre-strike status quo is

29

modified.  *See McAllister Bros.*, 312 NLRB 1121, 1121-23 (1993) (the employer lawfully placed strikers in its company plans when the strike ended, after reaching impasse on the issue of benefits contributions during the strike).

In the instant case, the parties incurred the intervening event of the Employer's Notices of Intent to Cancel contributions, coupled with the Trust Funds' refusal to accept contributions for compensable hours after September 30, 2008.  On February 18, 2009, the Trust Funds set forth two new conditions precedent before they would accept new contributions.  (GC Exh. 75.)  The Employer's legal duty to restore the pre-strike status quo on benefits had clearly changed both by its Notices to Cancel and by the Trust Funds' additional new requirements to revive contributions.

In the context of these intervening events, the question then becomes: What was the status quo on February 26, 2009, when the strikers unconditionally returned to work?  The status quo are the facts on the ground at that time. Here, the status quo was:  (1) the Employer had submitted Notices of Cancellation to the Trust Funds in September 2008; (2) the Trust Funds refused to accept contributions after the Notices of Cancellation had been submitted; (3) the Employer had been escrowing Pension and Retirees Health & Welfare contributions for strikers and crossovers; (4) the Employer was providing coverage for its crossovers under its Company medical plan; and (5) the Trust Funds insisted

30

on a new Interim Labor Agreement <u>and</u> new Subscription Agreements before they would accept contributions.  (GC Exh. 75.)

When the strikers returned to work on February 26, 2009, Oak Harbor simply maintained the then-existing benefits arrangement that was in place (*i.e.*, the status quo).  This included:  (1) escrow Teamsters Pension contributions; (2) escrow Teamsters Retirees Health & Welfare contributions; and (3) place the returning strikers in the Company medical plan.  As had previously been agreed to (for crossovers and strikers' benefits during the strike), this temporary benefits arrangement was maintained pending the outcome of full contract negotiations.  Contrary to the Board's Decision, this is **<u>not</u>** a unilateral change.   Nothing changed.

2. **<u>Alternatively, the Board erred in failing to find that the parties had reached impasse on the interim benefits issue after bargaining in good faith between February 17 and 26, 2009.</u>**

By the time the strikers returned to work on February 26, 2009, Oak Harbor and the Union had reached impasse on the issue of interim benefits

pending the outcome of full contract negotiations.[5] "A bargaining impasse – which justifies an employer's unilateral implementation of new terms and conditions of employment – occurs when 'good faith negotiations have exhausted the prospects of concluding an agreement'…leading both parties to believe that they are 'at the end of their rope.'" *TruServ Corp. v. NLRB*, 254 F.3d 1105, 1114 (D.C. Cir. 2001), cert. denied, 534 U.S. 1130 (2002) (quoting *Taft Broadcasting Co.*, 163 NLRB 475, 478 (1967), enfd., 395 F.2d 622 (D.C. Cir. 1968); *PRC Recording Co.*, 280 NLRB 615, 635 (1986), enfd., 836 F.2d 289 (7th Cir. 1987)). The Board considers several factors in determining whether an impasse was reached, including: "'the bargaining history, the good faith of the parties in negotiations, the length of the negotiations, the importance of the issue or issues as to which there is disagreement, [and] the contemporaneous understanding of the

---

[5] At the hearing, an issue arose whether Oak Harbor raised the affirmative defense of an impasse and right to implement its proposal on benefits for the returning strikers in February 2009. The Employer's Affirmative Defenses 8 and 9 in its Answer stated the elements of impasse following negotiations. Furthermore, to the extent there was any question about this affirmative defense being pled, the Employer moved to clarify and amend its affirmative defenses to include the right to implement at impasse, following good faith negotiations. (Tr. 1560.) Board law expressly permits an employer to timely raise an affirmative defense in its Answer or at the hearing. *See Avne Systems*, 331 NLRB 1352, n.1 (2000); *New Associates*, 314 NLRB 893, 894 (1994) (citing *15th Avenue Iron Works*, 301 NLRB 878, 879, n.12 (1991), enfd., 964 F.2d 1336 (2nd Cir. 1992)). Just as the General Counsel can amend its complaint at the hearing, so too, can the employer raise an affirmative defense at the hearing.

parties as to the state of negotiations.'" *TruServ*, 254 F.3d at 1114 (quoting *Taft*, 163 NLRB at 478).

In full contract negotiations, "[i]mpasse over a single issue may create an overall bargaining impasse that privileges unilateral action if the issue is 'of such overriding importance' that it frustrates the progress of further negotiations." *Laurel Bay Health & Rehabilitation Center*, 353 NLRB 232, 232-33 (2008), adopted by 356 NLRB No. 3 (2010), enfd. in part, 666 F.3d 1365 (D.C. Cir. 2012) (quoting *CalMat Co.*, 331 NLRB 1084, 1097 (2000)). Generally, an employer may not take unilateral action absent impasse in overall contract negotiations. However, exceptions to this general rule apply. Relevant to the Oak Harbor matter is the exception involving economic exigencies. The strike ended. Strikers were returning to work. What would their benefits be? This is an economic exigency. As the Board has explained:

> [T]here are other economic exigencies, although not sufficiently compelling to excuse bargaining altogether, that should be encompassed within the *Bottom Line* [302 NLRB 373 (1991)] exception. Thus, in *Dixon Distributing Co.*, 211 NLRB 241, 244 (1974), a case predating *Bottom Line*, the administrative law judge acknowledged that when negotiations for a contract are ongoing, matters may arise where the exigencies of a situation require prompt action for which bargaining is appropriate. The judge noted that in these and other related circumstances, "management does need to run its business, and changes in operations toward that end often cannot await the ultimate full-fledged contract bargaining." *Dixon*, 211 NLRB at 244. When these circumstances occur, we believe that the general *Bottom Line* rule foreclosing changes absent overall impasse in bargaining for an agreement as a whole should not apply. Instead,

we will apply the traditional principles governing bargaining over changes in terms and conditions of employment referred to in *Bottom Line*. Thus, <u>where we find that an employer is confronted with an economic exigency compelling prompt action short of the type relieving the employer of its obligation to bargain entirely, we will hold under the *Bottom Line Enterprises* exigency exception, as further explicated here, that the employer will satisfy its statutory obligation by providing the union with adequate notice and an opportunity to bargain</u>. In that event, consistent with established Board law in situations where negotiations are not in progress, the employer can act unilaterally if either the union waives its right to bargain or the parties reach impasse on the matter proposed for change.

*RBE Electronics*, 320 NLRB 80, 81-82 (1995) (emphasis added). *See also St. Mary's Hospital of Blue Springs*, 346 NLRB 776, 776 (2006) (The employer lawfully implemented health coverage changes after bargaining with the union to impasse on this narrow issue, even though the parties had not yet reached impasse on overall contract negotiations. Absent any action by the employer, the employees would have suffered a disruption in coverage.); *see also Pro Quo Books*, 2010 WL 2020778 (N.L.R.B.G.C.) (NLRB General Counsel explained that the employer was privileged to implement, at good-faith impasse, provisional wage rates due to time-sensitive exigent circumstances, even though the parties had not yet reached impasse in overall contract negotiations.).

In *Mail Contractors of America, Inc.*, 346 NLRB 164, n.1 (2005), the Board found an economic exigency permitted the employer to implement a new healthcare plan for its Kansas facility (citing *RBE Electronics*, 320 NLRB at 82). In late 2001, the employer decided to change its healthcare plan for its non-union

34

employees at other facilities. *Id.* at 165, 167-69. At the time, this included the Kansas facility at issue. *Id.* at 165. Mail Contractors voluntarily recognized the union for its Kansas facility in the spring of 2002. *Id.* The employer's healthcare plan was set to expire on August 31, 2002. *Id.* at 167. The employer announced the upcoming medical plan expiration, and it presented the new company healthcare plan to the union in the summer of 2002. *Id.* at 167-68. The union asserted that the employer must maintain the status quo, pending the resolution of overall contract negotiations. *Id.* at 172. Just as with Oak Harbor, the parties disagreed as to what constituted the status quo. *Id.* at 172-73. The employer asserted that the status quo was maintained because the Kansas employees could not remain in the previous health plan, and the new company-wide plan constituted the status quo. *Id.* at 174. The employer implemented the new healthcare plan on September 1, 2002. *Id.* at 167-68. Just as Oak Harbor did, Mail Contractors stated its willingness to negotiate a different plan in full contract negotiations. *Id.* at 175. The ALJ found no violation and dismissed the complaint. *Id.* The ALJ specifically noted that, "If the Employer had not implemented the company-wide plan for the [Kansas] unit, those employees would have been without health insurance." *Id.* Critically, the Board affirmed, finding that these facts constituted an "economic exigency." *Id.* at n.1.

In *Electrical South, Inc.*, 327 NLRB 270, 270-71 (1998), the Board held that the employer did not violate the Act by implementing an interim health insurance plan in the midst of ongoing contract negotiations. The employer had informed the union that it faced an imminent lapse in health insurance coverage for bargaining unit employees or a seventy percent increase in premiums to continue the existing coverage. *Id.* at 270. The parties agreed to bargain over interim insurance coverage separate from overall contract negotiations. *Id.* However, the parties were unable to reach agreement on an interim solution. *Id.* at 271. The employer implemented its interim proposal. *Id.* The Board concluded that the employer's implementation of the interim insurance coverage was lawful because the parties had reached impasse on this issue. *Id.*

This Court has also recognized that an economic exigency requiring prompt action may permit an employer to act unilaterally. *See Vincent Industrial Plastics, Inc. v. NLRB*, 209 F.3d 727, 734-35 (D.C. Cir. 2000)(Noting that under NLRB precedent, economic exigency is one exception to the general rule prohibiting unilateral changes. However, the Court found that the employer failed to identify any exigency justifying its changes to its attendance policy in that case.).

What was the exigency at Oak Harbor? The return of the strikers. The Union informed the Employer on February 17, 2009 that the strikers would be returning to work. On February 18, 2009, the Trust Funds announced their new

requirements, including a new Interim Labor Agreement and new Subscription Agreements, before they would accept benefits contributions. Oak Harbor understood it had a legal obligation to maintain the status quo with respect to benefits for the returning strikers. However, the intervening events (Notices to Cancel Contributions in September 2008 and the Trust Funds' February 18, 2009 insistence on a new Interim Labor Agreement and new Subscription Agreements) had modified the status quo prior to the strikers' return to work. Given the Trust Funds' refusal to accept benefits contributions without their conditions precedent being satisfied, prompt action was necessary to provide benefits coverage for the returning strikers.

Other than applying the then-existing benefits to the returning strikers (*i.e.*, the status quo discussed in Section C(1) above), the only other logical thing to do in February 2009 was to bargain with the Union over an interim benefits arrangement for the returning strikers. Prompt action was necessary to ensure that the returning strikers had benefits coverage (pending overall contract negotiations) when they returned to work on February 26, 2009. Thus, on February 17, 2009, the Employer began its position by proposing that the returning strikers should be placed in the Company medical plan, and escrow Teamsters Pension and escrow Teamsters Retirees Health & Welfare contributions (consistent with the then-existing benefits arrangement). On February 18, 2009, the Trust Funds announced

37

that they required a new Interim Labor Agreement and new Subscription Agreements.  On February 20 and 24, 2009, Braun offered a middle-ground alternative to Hobart – Company medical plan and Union Pension for the returning strikers.  On February 21, 22, 24, and 25, 2009, Payne proposed an alternative offer to the Union – Company medical plan, Union Pension, and escrow Retirees Health & Welfare. The Employer's "what-if" proposals were repeatedly rejected by the Union.  (Tr. 1038, 1045-46, 1049-50, 1054-56, 1066, 1244-49; Resp. Exhs. 17-20, 26.)

The Union's position was firmly entrenched.  The Union insisted that the Employer sign its proposed Interim Labor Agreement and new Subscription Agreements to revive the Union benefit plans.  The Union had adopted a hardline position that Oak Harbor was legally required to execute the Interim Labor Agreement and the Subscription Agreements to return to pre-strike conditions.[6] (Tr. 592-93, 1173:12, 1238:25; GC Exh. 75.)

Oak Harbor searched for a middle-ground with the Union regarding benefits for returning strikers, only to be met with an "all-or-nothing" response from the Union.[7]  Bad faith bargaining is most often defined by a refusal to meet, a refusal to move from one's position, a refusal to discuss the issues, or an unwillingness to

---

[6] In fact, the General Counsel adopted the same position in its <u>Fourth Amended Consolidated Complaint</u>.  (GC Exh. 1(rr).)

[7] The ALJ also acknowledged that Oak Harbor's middle-ground alternative was rejected by the Union.  (ALJ Decision 9:44-46.)

compromise. *See National Management Consultants*, 313 NLRB 405 (1993). Here, Oak Harbor met its duty to bargain in good faith in February 2009.

During the strike and in February 2009, both the Employer and the Union understood that temporary arrangements needed to be established with respect to benefits. Oak Harbor had lawfully discontinued payments to the Trust Funds (by the September 2008 Notices of Intent to Cancel). Oak Harbor then had an obligation to bargain with the Union regarding what to do thereafter. This is exactly what Oak Harbor did. In October 2008, Oak Harbor proposed, and the Union accepted, an interim arrangement for crossovers' benefits. In November 2008, they discussed and reached agreement on temporary benefits contributions on strikers' vacation hours. In February 2009, they again bargained over interim benefits contributions for the returning strikers. On February 18, 2009, the Trust Funds imposed new conditions in order to accept contributions into their Funds (a new Interim Labor Agreement and new Subscription Agreements). Oak Harbor bargained the effects of the Trust Funds' requirements with the Union. The Union adopted a hardline stance and refused to consider any alternatives. Oak Harbor attempted to reach a middle-ground compromise with the Union, to no avail. The parties could not reach an agreement on what to do regarding the returning strikers' benefits, pending the outcome of full contract bargaining.

39

What else could Oak Harbor have done?  An exigency existed.  Oak Harbor was not legally required to enter into an Interim Labor Agreement to reinstitute Trust Fund contributions.  The ALJ correctly found (and the Board affirmed) that Section 8(d) of the Act prohibits the Board from requiring a party to sign an agreement to which it has not agreed to be bound.  Some interim benefits coverage was necessary for the returning strikers.  However, a stalemate had been reached. *See Hi-Grade Materials Co.*, 239 NLRB 947 (1978), wherein the union repeatedly insisted that the company sign a "letter of acceptance form and Trust Agreement" after the contract expired.  Hi-Grade wanted to negotiate into its company benefit plan.  *Id.* at 949-51.  The ALJ and Board found that the union foreclosed the possibility of further negotiations on this subject by adamantly insisting that there was only one way (via its Trust documents) for the company to pay into benefit plans.  *Id.* at 947, 954.  The union created an impasse.  *Id.* at 954.

In the instant matter, substantial evidence on the record shows that the parties, indeed, reached impasse on the interim benefits issue by February 26, 2009.  Therefore, the Employer lawfully implemented its Company medical plan for returning strikers on an interim basis on February 26, 2009.  Oak Harbor never foreclosed the Union's opportunity to negotiate benefits in the full contract negotiations.  The Board's conclusion that Oak Harbor violated the Act by **unilaterally** implementing its benefits plan on February 26, 2009 is unsupported

40

by substantial evidence and is contrary to Board precedent.   Where was the "unilateral" action?  The parties bargained to no avail.

For the same reasons discussed in this Section, Oak Harbor's implementation of its Company medical plan for the Oregon Teamsters was also lawful.

**3.** **To the extent the Board adopted the ALJ's Determination that the bargaining over benefits was part and parcel of overall contract negotiations, such conclusion must be reversed as not supported by substantial evidence.**

The Trust Funds had categorically refused to accept contributions.   On October 9, 2008, Hobart agreed to Oak Harbor's October 3, 2008 proposal regarding benefits contributions for crossovers.  On November 17, 2008, Hobart agreed to Oak Harbor's proposal regarding benefits contributions for vacationing strikers.  These agreements were temporary, pending the outcome of the strike and pending negotiations for a new labor agreement.  There is no evidence that these were agreements reached with respect to matters that would be contained in the overall collective bargaining agreement.  In fact, the parties continued to negotiate over Pension and Health & Welfare benefits as they pertained to a successor labor agreement at their mediation sessions on October 9, 2008 and November 7, 2008. The parties agreed that, despite the October and November 2008 temporary benefits arrangements, they would continue bargaining over Pension and Health & Welfare in overall contract negotiations.  (GC Exhs. 54, 59-60, 63(a)-(b), 65-66;

Resp. Exh. 12; Tr. 471, 499-500, 502:22-506:4, 538:5-12, 992-93, 1010-11, 1094-95.)

On February 17, 2009, the Employer and the Union met to discuss return to work issues, including benefits, for the returning strikers.  The Trust Funds were still not accepting contributions.  Thus, the Employer and the Union discussed benefits for the returning strikers, as they pertained to a temporary arrangement pending full contract negotiations.  No temporary agreement was reached at the February 17, 2009 meeting.  (Tr. 1016-24, 1228-35; GC Exhs. 24, 25; Resp. Exh. 15.)

Between February 19 and 25, 2009, Payne and Ballew bargained over the Employer's February 17 proposal concerning an <u>interim</u> arrangement for benefits, pending full contract bargaining.  Again, the Trust Funds were not accepting contributions.  Some interim medical coverage was necessary.  At the hearing, both Payne and Ballew explained that they were <u>not</u> bargaining with respect to overall contract negotiations in February 2009.  Rather, they were bargaining over the "status quo" with respect to benefits contributions for returning strikers.  (Tr. 613-14, 630-31, 661-62, 1038, 1049-50, 1066, 1134:6-22, 1143-44; Resp. Exh. 20.)

Ballew explained that negotiations for a successor labor agreement were ongoing, but he was <u>not</u> involved in those negotiations.  Rather, "all [Ballew] was talking to [Payne] about was trying to focus on what would be the minimum

necessary to get back to the status quo" on Pension and Health & Welfare for the returning strikers.  (Tr. 630.)

Payne agreed as to the interim nature of their negotiations.  Payne testified: "…[Ballew and I] were talking about the conditions under which the returning strikers would come back."  (Tr. 1143:24-25.)

Payne and Ballew were bargaining over a separate, temporary arrangement regarding medical benefits for returning strikers, because of the Trust Funds' refusal to accept contributions absent an Interim Labor Agreement and new Subscription Agreements.  (Tr. 608, 613-14, 630-31, 661-62, 1034-40, 1046, 1049-50, 1066, 1134:6-22, 1143-44; Resp. Exh. 20; GC Exhs. 75(a)-(d).)  The same holds true for Braun's discussions with Hobart on February 20 and 24, 2009. (Tr. 1244-1249.)  They were interim in nature.

The negotiations from February 17 through 25, 2009 regarding Trust Fund contributions for returning strikers were not part and parcel of overall contract negotiations.  (ALJ Decision 7:21-10:6, 15:22-16:16, 20:24-21:7.)  The Union and the Employer concurred on this point.  Any conclusion that the Employer had piecemealed the implementation of an overall contract bargaining proposal is incorrect and not supported by substantial evidence.

## <u>CONCLUSION</u>

For all of the reasons stated above, Oak Harbor respectfully requests that the Court grant its Petition for Review and find that Oak Harbor did not violate the Act by ceasing contributions to the Oregon Trust and by implementing its Company medical plan on February 26, 2009.

Respectfully submitted this 18th day of November, 2015.

By:   /s/ *Selena C. Smith*
John M. Payne, D.C. Cir. Bar #54201
Selena C. Smith, D.C. Cir. Bar #54203
Davis Grimm Payne & Marra
701 Fifth Avenue, Suite 4040
Seattle, WA  98104
Telephone: (206) 447-0182
jpayne@davisgrimmpayne.com
ssmith@davisgrimmpayne.com

Peter N. Kirsanow, D.C. Cir. Bar #54050
Benesch, Friedlander, Coplan & Aronoff
200 Public Square #2300
Cleveland, OH  44114-2378
Telephone: (216) 363-4481
pkirsanow@beneschlaw.com

*Attorneys for Petitioner Oak Harbor Freight Lines, Inc.*

## <u>CERTIFICATE OF COMPLIANCE WITH RULE 32(a)</u>

### Certificate of Compliance with Type-Volume Limitation, Typeface Requirements, and Type Style Requirements

1.   This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) and the Court's Orders dated May 22, 2015 (Doc. No. 1553770) and June 12, 2015 (Doc. No. 1557152) because:

    ☒ this brief contains 9,984 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii) and D.C. Cir. R. 32(e)(1), or

    ☐ this brief uses a monospaced typeface and contains _____ lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

    ☒ this brief has been prepared in a proportionally spaced typeface using Microsoft Office Word 2013 in size 14, Times New Roman, or

    ☐ this brief has been prepared in a monospaced typeface using _____ with _____.

Dated:  November 18, 2015

/s/ *Selena C. Smith*
Selena C. Smith, D.C. Cir. Bar #54203
Davis Grimm Payne & Marra
701 Fifth Avenue, Suite 4040
Seattle, WA  98104
Telephone: (206) 447-0182
ssmith@davisgrimmpayne.com

***Attorneys for Petitioner Oak Harbor Freight Lines, Inc.***

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I caused to be electronically filed the above and foregoing: "Brief of Petitioner Oak Harbor Freight Lines, Inc." with the Clerk of the Court for the United States Court of Appeals for the D.C. Circuit by using the appellate CM/ECF system on November 18, 2015.  Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system as follows:

<u>**Attorneys for NLRB**</u>
Linda Dreeben
Usha Dheenan
Jared Cantor
National Labor Relations Board
(appellatecourt@nlrb.gov)
(linda.dreeben@nlrb.gov)
(usha.dheenan@nlrb.gov)
(jared.cantor@nlrb.gov)

<u>**Attorneys for Teamsters Unions**</u>
Reid Pedersen McCarthy & Ballew
Thomas A. Leahy
(tom@rpmb.com)

I also hereby certify that on November 18, 2015, I caused to be served true and correct copies of the same upon the following as indicated below:

<u>**Via First-Class U.S. Mail/Email**</u>
Richard W. Gibson
(Rgibson@teamster.org)
Office of General Counsel
Int'l Bhd of Teamsters AFL-CIO
25 Louisiana Avenue NW
Washington, D.C.  20001-0000

<u>**Via First-Class U.S. Mail/Email**</u>
Irene Botero
(Irene.Botero@nlrb.gov)
NLRB – Region 19
915 Second Ave #2948
Seattle, WA  98174-1078

46

**Via First-Class U.S. Mail/Email**
Helena Fiorianti
([Helena.Fiorianti@nlrb.gov](mailto:Helena.Fiorianti@nlrb.gov))
NLRB – Subregion 36
1220 SW 3rd Ave., Ste. 605
Portland, OR  97204-2170

**Via First-Class U.S. Mail/Email**
Michael McCarthy
([mike@rpmb.com](mailto:mike@rpmb.com))
Reid Pedersen McCarthy & Ballew
100 W Harrison St. #300 N. Tower
Seattle, WA  98119-4143

**Via First-Class U.S. Mail**
Ronald K. Hooks
NLRB – Region 19
915 Second Ave #2948
Seattle, WA  98174-1078

**Via First-Class U.S. Mail/Email**
Paul C. Hays
([pchayslaw@comcast.net](mailto:pchayslaw@comcast.net))
Carney Buckley Hays
1500 SW First Ave #1015
Portland, OR  97201

**Via First-Class U.S. Mail**
Rick Hicks
Int'l. Brotherhood of Teamsters
14675 Interurban Ave. S., Suite 305
Tukwila, WA  98168-4614

Dated this 18th day of November, 2015.

By:    */s/Selena C. Smith*
John M. Payne, D.C. Cir. Bar #54201
Selena C. Smith, D.C. Cir. Bar #54203
Davis Grimm Payne & Marra
701 Fifth Avenue, Suite 4040
Seattle, WA  98104
Telephone:  (206) 447-0182

Peter N. Kirsanow, D.C. Cir. Bar #54050
Benesch, Friedlander, Coplan & Aronoff
200 Public Square  #2300
Cleveland, OH  44114-2378
Telephone:  (216) 363-4481

*Attorneys for Oak Harbor Freight Lines, Inc.*

# ADDENDUM OF STATUTES AND REGULATIONS

**to**

**Opening Brief of Petitioner
Oak Harbor Freight Lines, Inc.**

# ADDENDUM OF STATUTES AND REGULATIONS

**National Labor Relations Act, 29 U.S.C. § 158(a)(1):**

(a) [Unfair labor practices by employer] It shall be an unfair labor practice for an employer—

(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 7 [section 157 of this title];

**National Labor Relations Act, 29 U.S.C. § 158(a)(5):**

(a) [Unfair labor practices by employer] It shall be an unfair labor practice for an employer—

(5) to refuse to bargain collectively with the representatives of his employees, subject to the provisions of section 9(a) [section 159(a) of this title].

**National Labor Relations Act, 29 U.S.C. § 158(d):**

(d) [Obligation to bargain collectively] For the purposes of this section, to bargain collectively is the performance of the mutual obligation of the employer and the representative of the employees to meet at reasonable times and confer in good faith with respect to wages, hours, and other terms and conditions of employment, or the negotiation of an agreement or any question arising thereunder, and the execution of a written contract incorporating any agreement reached if requested by either party, but such obligation does not compel either party to agree to a proposal or require the making of a concession: Provided, That where there is in effect a collective- bargaining contract covering employees in an industry affecting commerce, the duty to bargain collectively shall also mean that no party to such contract shall terminate or modify such contract, unless the party desiring such termination or modification—

49

**National Labor Relations Act, 29 U.S.C. § 160(a):**

(a) [Powers of Board generally] The Board is empowered, as hereinafter provided, to prevent any person from engaging in any unfair labor practice (listed in section 8 [section 158 of this title]) affecting commerce. This power shall not be affected by any other means of adjustment or prevention that has been or may be established by agreement, law, or otherwise: Provided, That the Board is empowered by agreement with any agency of any State or Territory to cede to such agency jurisdiction over any cases in any industry (other than mining, manufacturing, communications, and transportation except where predominately local in character) even though such cases may involve labor disputes affecting commerce, unless the provision of the State or Territorial statute applicable to the determination of such cases by such agency is inconsistent with the corresponding provision of this Act [subchapter] or has received a construction inconsistent therewith.

**National Labor Relations Act, 29 U.S.C. § 160(e):**

(e) [Petition to court for enforcement of order; proceedings; review of judgment] The Board shall have power to petition any court of appeals of the United States, or if all the courts of appeals to which application may be made are in vacation, any district court of the United States, within any circuit or district, respectively, wherein the unfair labor practice in question occurred or wherein such person resides or transacts business, for the enforcement of such order and for appropriate temporary relief or restraining order, and shall file in the court the record in the proceeding, as provided in section 2112 of title 28, United States Code [section 2112 of title 28]. Upon the filing of such petition, the court shall cause notice thereof to be served upon such person, and thereupon shall have jurisdiction of the proceeding and of the question determined therein, and shall have power to grant such temporary relief or restraining order as it deems just and proper, and to make and enter a decree enforcing, modifying and enforcing as so modified, or setting aside in whole or in part the order of the Board. No objection that has not been urged before the Board, its member, agent, or agency, shall be considered by the court, unless the

failure or neglect to urge such objection shall be excused because of extraordinary circumstances. The findings of the Board with respect to questions of fact if supported by substantial evidence on the record considered as a whole shall be conclusive. If either party shall apply to the court for leave to adduce additional evidence and shall show to the satisfaction of the court that such additional evidence is material and that there were reasonable grounds for the failure to adduce such evidence in the hearing before the Board, its member, agent, or agency, the court may order such additional evidence to be taken before the Board, its member, agent, or agency, and to be made a part of the record. The Board may modify its findings as to the facts, or make new findings, by reason of additional evidence so taken and filed, and it shall file such modified or new findings, which findings with respect to question of fact if supported by substantial evidence on the record considered as a whole shall be conclusive, and shall file its recommendations, if any, for the modification or setting aside of its original order. Upon the filing of the record with it the jurisdiction of the court shall be exclusive and its judgment and decree shall be final, except that the same shall be subject to review by the appropriate United States court of appeals if application was made to the district court as hereinabove provided, and by the Supreme Court of the United States upon writ of certiorari or certification as provided in section 1254 of title 28.

## National Labor Relations Act, 29 U.S.C. § 160(f):

(f) [Review of final order of Board on petition to court] Any person aggrieved by a final order of the Board granting or denying in whole or in part the relief sought may obtain a review of such order in any United States court of appeals in the circuit wherein the unfair labor practice in question was alleged to have been engaged in or wherein such person resides or transacts business, or in the United States Court of Appeals for the District of Columbia, by filing in such court a written petition praying that the order of the Board be modified or set aside. A copy of such petition shall be forthwith transmitted by the clerk of the court to the Board, and thereupon the aggrieved party shall file in the court the record in the proceeding, certified by the Board, as provided in section 2112

of title 28, United States Code [section 2112 of title 28]. Upon the filing of such petition, the court shall proceed in the same manner as in the case of an application by the Board under subsection (e) of this section, and shall have the same jurisdiction to grant to the Board such temporary relief or restraining order as it deems just and proper, and in like manner to make and enter a decree enforcing, modifying and enforcing as so modified, or setting aside in whole or in part the order of the Board; the findings of the Board with respect to questions of fact if supported by substantial evidence on the record considered as a whole shall in like manner be conclusive.